## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ZIPBY USA LLC, TMA GROUP OF
COMPANIES LIMITED, and TMA
CAPITAL AUSTRALIA PTY LTD,

              Plaintiffs,

v.

GREGORY PARZYCH,

              Defendant.

Civil Action No. 1:20-cv-10926-IT

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S, GREGORY PARZYCH, RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(B) OF THE FEDERAL RULES OF CIVIL PROCEDURE AS TO THE VERDICT BY THE JURY ON COUNTS I, II, III, IV, V, VI, VII, OF PLAINTIFFS' AMENDED COMPLAINT

The Defendant, Gregory Parzych, hereby moves that this Honorable Court allow this

Motion and set aside the verdict entered by the Jury on December 4, 2023 and enter judgment for

the Defendant, Gregory Parzych, on the following Counts of the Plaintiffs' Amended Complaint:

**Count 1/Breach of Fiduciary Duty**

Defendant found liable to Plaintiff ZipBy USA and Plaintiff TMA Group

**Count 2/Breach of Contract**

Defendant found liable to Plaintiff ZipBy for breach of the Employment Agreement

Defendant found liable to Plaintiff TMA Group for breach of the Employment

Agreement.

Defendant found liable to Plaintiff ZipBy for breach of the Employee Non Disclosure,

Inventions and Intellectual Property Agreement.

Defendant found liable to ZipBy for breach of the Employee Handbook.

1

Defendant found liable to TMA Group for breach of the Employee Handbook.

**Count 3 and 4/Misappropriation of Trade Secrets**

Defendant found liable to Plaintiffs ZipBy entities.

Defendant's misappropriation found to be "willful and malicious".

**Count 5 and 7/Trademark**

Defendant found liable to Plaintiff ZipBy.

Defendant found liable to Plaintiff TMA Capital.

**Count 6/False Designation**

Defendant found liable to Plaintiff ZipBy.

Defendant found liable to Plaintiff TMA Capital.

**Standard**

A renewed motion for judgment as a matter of law under Rule 50(b) (the rule formerly known as "judgment notwithstanding the verdict" or J.N.O.V.) is subject to a demanding standard. *See Censullo v. Brenka Video, Inc.*, 989 F.2d 40, 42 (1st Cir. 1993). A court may grant judgment as a matter of law after a trial. Fed. R. Civ. P. 50(b). A court should grant judgment as a matter of law "if a reasonable person could not have reached the conclusion of the jury." *White v. New Hampshire Dep't of Corrections*, 221 F.3d 254, 259 (1st Cir. 2000). The court must "construe the facts in the light most favorable to the jury verdict and draw any inferences in favor of the non-movant." *Sánchez v. Foley*, 972 F.3d 1, 10 (1st. Cir. 2020). Courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." *Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico*, 554 F.3d 164, 170 (1st Cir. 2009) (quoting *Marcano Rivera v. Turabo*

*Med. Ctr. P'ship*, 415 F.3d 162, 167 (1st Cir. 2005)). No reasonable jury could have returned a verdict in favor of the Plaintiffs based on the evidence introduced at trial.  Defendant will address each Count of Plaintiffs' Amended Complaint in turn.

**Count I/Breach of Fiduciary Duty**

A fiduciary is not entirely prohibited from pursuing a corporate opportunity, but may do so when the corporation has knowledge of the opportunity and has declined to pursue it. *Demoulas Id. at 530. Renco Corp. v. GammaSupplies, LLC, 90 Mass.App.Ct. 1108, 59 N.E.3d 457(Table) (Mass. App. 2016)* It is undisputed that Mr. Anthony Karam, on behalf of the Plaintiffs, was notified of an opportunity to acquire TCS International, Inc.  It is undisputed that Mr. Parzych, the fiduciary, brought the opportunity to Mr. Anthony Karam.

Q. You received a call from Morten, and he emailed you, correct?

A. He received a call from Morten. He then called me and then emailed me.

**MS. BLAIR**: If we can go to Exhibit 169, please. Witness only.

BY **MS. BLAIR**:

Q. And do you see that document, sir?

A. Yes.

Q. Do you recognize that document?

A. Yes, I do.

Q. And this is an email from Mr. Parzych to you on January 9, 2020, correct?

A. Yes, it is.

Q. And the subject of the email is "Call with Morten today"?

A. Yes.

Q. So do you take from that that Mr. Parzych called you the same day that he -- excuse

me -- emailed you the same day he received a call from Mr. Andersson?

A. Yes.

**MS. BLAIR**: I'd like to introduce that, Your Honor, as the next exhibit.

**MR. COTTER**: No objection.

**Day 3 64:2-24**

Q-Free provided a one page document entitled "parking forecast".  Mr. Parzych received and forwarded the email. Mr. Karam reviewed the exact same information that was reviewed by Mr. Parzych. None of those facts were disputed. Mr. Karam reviewed a summary. He did not request or review tax returns for TCS International, Inc. **(Day 3 76:1-18)** Mr. Parzych had no authority to decide whether to acquire TCS. The Board of Directors had sole authority to make that decision. It is undisputed that Mr. Anthony Karam and his Board of Directors made the determination not to acquire TCS International, Inc.

Further, the Plaintiffs did not submit any evidence as to actual damages suffered, or, actual profits earned by Defendant as a result of the corporate opportunity. Where a corporate fiduciary obtains a gain or advantage through a violation of his duty of loyalty, a court may properly order restitution of the gain, so as to deny any profit to the wrongdoer and prevent his unjust enrichment." *Demoulas v. Demoulas, 424 Mass. at 556, 677 N.E.2d 159*. See also *Hanover Ins. Co. v. Sutton, 705 N.E.2d 279, 46 Mass.App.Ct. 153 (Mass. App. 1999)* (In the absence of evidence at trial regarding Sutton's profits derived from his stock purchase, the judge appropriately granted Hanover equitable relief under count V).

The only "evidence" introduced by Plaintiffs as to damages was not actual lost profits, or disgorgement of profits earned by Parzych, but was complete speculation proffered by Mr. William Scally. Mr. Scally had no experience in the parking industry.  Mr. Scally never

examined the books and records of TCS International, Inc. Mr. Scally never audited the

information upon which he relied.  Mr. Scally made a guess. Mr. Scally made a guess as to what

could be earned by a company, ZipBy, that acquired another parking company, TCS

International, Inc., on the eve of a worldwide pandemic and ultimate global shutdown.  Mr.

David Radford testified that the losses to TCS International, Inc. as a result of the COVID

pandemic were catastrophic.

Q. Mr. Radford, in connection with the revenue in 2021, were there -- were there any

attempts on your part to alleviate any potential losses for that year?

A. Absolutely.

Q. And what were they?

A. Well, the first thing you do is you look at expenses. We eliminated trade show

participation, air travel, which was not by our own choice, marketing materials, memberships

and associations, anything like that that we could cut out. I allowed my staff to work remotely

and, obviously, in order for them to save commuting costs and clothing and so on and so forth.

Just everywhere we could save money, we tried.

Q. So you did everything you could do or thought you could do as president to alleviate

any potential losses?

A. Correct.

Q. And did you suffer a loss in 2021?

A. In '21, yes.

Q. And what was the loss, sir?

A. Those were 286, I believe, was on our tax return.

Q. Is that 286,000?

MR. PAINE: Objection.

THE WITNESS: 286,000. I'm sorry.

THE COURT: I'm going to allow it. I'm going to allow you to do cross-examination.

BY MR. DIONISI:

Q. In the year 2022, if you see on the exhibit, Mr. Radford, the total revenue prohibited was $8,357,208.

A. Uh-huh.

Q. And what was the actual revenue that was earned that year by TCS?

MR. PAINE: Objection.

THE COURT: So you have a standing objection to all of this. But I'm going to allow it, and then I'm going to allow cross-examination of it, so that's where we're going to go.

BY MR. DIONISI:

Q. You can answer.

A. Okay. I believe it was 1.6, 1.6 million.

Q. 1.6 million? A. Yes.

Q. And did you as president do anything internally with TCS to alleviate any potential losses?

A. Yes.

Q. And what did you do in 2022?

A. Further to that, not a dates -- I can't -- for the dates, but we were able to negotiate a PPP program and a SBA loan. Those were tools through the federal government that helped companies stay alive.

Q. And what would be the effect on TCS if that PPP funding was not received?

A. It probably would have closed down. We would have shut the doors. We wouldn't have survived.

Q. Did TCS report a loss for 2022?

A. Yes. Q. How much of a loss was reported in 2022?

A. 400,000.

Q. In the year 2023, which we've gone through 11 months now, the total revenue that was projected was $8,661,679. To the point of around today, sir, do you have an account of what the total revenue is for 2023?

A. Yes.

Q. And what is that, sir?

A. I'm hoping to post about 3.5 million.

Q. And do you expect, sir, to have a -- or to turn a profit for 2023?

A. No.

Q. Do you expect to -- suffer a loss?

A. No. I'm assuming break-even point would be by goal.

Q. 2023, you expect to have a break-even goal?

A. Yes.

**Day 5 page 148-155**

Q. What do you account for the reduction in revenue for '21, '22, and '23, Mr. Radford?

A. The COVID pandemic. It brought our industry to its knees.

**Day 5 page 155: 12-15**

Q. Mr. Radford, in terms of percentages, could you give a percentage of COVID as it has affected TCS?

A. Yes.

Q. And what is that percentage?

A. I would say a reduction of 80 percent in business.

**Day 5 page 157: 4-8**

Given Mr. Scally's speculation as to lost profits and Mr. Radford's testimony, as owner of the subject business, as to actual losses, no reasonable jury could have found that Mr. Scally's testimony proved the necessary element of damages to support a claim for breach of fiduciary duty.

**Count 2/Breach of Contract**

To state a claim for breach of contract, the plaintiffs must provide by a preponderance of the evidence that there was a valid contract between the parties, that the defendant breached his contractual duties, and that breach caused the plaintiffs damages. *Linton v. New York Life Ins. Corp*., 392 F. Supp. 2d 39, 41 (D. Mass. 2005) (Zobel, J.) (quoting *Michelson v. Digital Fin. Servs*., 167 F.3d 715, 720 (1st Cir. 1999)). *T.H. Glennon Co., Inc. v. Monday*, No. CV 18-30120-WGY, 2020 WL 1270970, at *5 (D. Mass. Mar. 17, 2020) The established principle of law upon which damages for breach of contract may be assessed is that the injured party shall be placed in the same position he would have been in if the contract had been performed." "The task of quantifying the consequences of violating a noncompetition clause is a particularly difficult and elusive one," *Frank D. Wayne Assocs., Inc. v. Lussier,* 16 Mass. App. Ct. 986, 988 (1983)

The Court entered summary judgment on the breach of the employment agreement but did not determine or decide the element of damages. Damages are a necessary element to prove a breach of contract. As argued infra, the Plaintiffs cannot rely on speculation to prove an element of damages.

The jury returned a verdict that the Defendant breached the Non Disclosure, Inventions, and Intellectual Property Agreement, the "IP" Agreement.  A necessary element to prove a violation of the "IP" Agreement is the existence of damages. The Plaintiffs did not prove that the information (the decision not to acquire TCS International, Inc. and the parking forecast) was confidential and did not submit any evidence that they suffered any damages as result any breach of the agreement. No reasonable jury could have found that the Plaintiffs suffered damages as a result of any breach of the IP Agreement.

The jury returned a verdict that the Defendant breached the "Employee Handbook". First, as a matter of law, an employee handbook is not a contract that is subject to a cause of action for breach. Plaintiff did not submit any evidence of an offer, acceptance, consideration or terms of this alleged contract. Second, the Defendant did not submit any evidence of any damages that resulted from an alleged breach of the Employee Handbook. No reasonable jury could have found that the Plaintiffs suffered damages as a result of any breach of the Employee Handbook.

**Count 3 and 4/Misappropriation of Trade Secrets**

A plaintiff may bring a misappropriation of trade secrets claim under the Defend Trade Secrets Act ("DTSA") (Count III) so long as the alleged secret relates to "a product or service used in, or intended for use in, interstate or foreign commerce . . ." *18 U.S.C. § 1836(b)(1),* and so long as the secret's owner has: (i) "taken reasonable measures to keep such information secret," *18 U.S.C. § 1839(3)(A)*; and (ii) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *18 U.S.C. § 1839(3)(B).*

The Plaintiffs have no cognizable trade secret claim until it has adequately identified the

specific trade secrets that are at issue.  *Iconics, Inc. v. Massaro* 266 F.Supp. 3d. 449 (D.Mass. 2017)  Massachusetts and the DTSA both require the Plaintiffs to demonstrate: (i) the existence of a trade secret; (ii) that the plaintiff "took reasonable steps to protect" its confidentiality; and (iii) the defendant "used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *See Data Gen. Corp. v. Grumman Sys. Support Corp.*, 825 F. Supp. 340, 357 (D. Mass. 1993) (Skinner, J.). *See also CardioNet, LLC v. InfoBionic, Inc.*, Civ. A. No. 15-11803-IT, 2017 WL 1115153, at *3 (D. Mass. March 24, 2017) (Talwani, J.). *T H. Glennon Company, Inc. v. Monday*, (Civil Action No. 18-30120-WGY)(March 17, 2020)

A trade secret is "anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement." *Mass. Gen. L. Ch. 266 § 30(4).* "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which [provides] an opportunity to obtain an advantage over competitors who do not know or use it." *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.,* 357 Mass. 728, 736, 260 N.E.2d 723 (1970).

The Massachusetts Uniform Trade Secrets Act defines "trade secret" as: specified or specifiable information, whether or not fixed intangible form or embodied in any tangible thing, including but not limited to a formula, pattern, compilation, program, device, method, technique, process, business strategy, customer list*,* invention, or scientific, technical, financial or customer data that (i) at the time of the alleged misappropriation, provided economic advantage, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, others who might obtain economic advantage from its

acquisition, disclosure or use; and (ii) at the time of the alleged misappropriation was the subject of efforts that were reasonable under the circumstances, which may include reasonable notice, to protect against it being acquired, disclosed or used without the consent of the person properly asserting rights therein or such person's predecessor in interest. *G.L.c. 93 section 42(4)*

There was insufficient evidence to submit to the Jury that the Defendant used "improper means, in breach of a confidential relationship, to **acquire** and use the "trade secret." The only evidence submitted to the Jury was that the Plaintiffs (1) provided Mr. Parzych with their decision not to acquire TCS International, Inc. and (2) instructed Mr. Parzych to obtain some high-level numbers from TCS International, Inc. As such, Mr. Parzych did not use any improper means or breach any confidential relationship to acquire the information and absolutely no evidence was submitted to the contrary. The information was provided by Plaintiffs to Defendant; they were not trying to keep the information from him.

The Plaintiffs submitted no evidence that the two items they described as trade secrets: (1) the decision not to acquire TCS International, Inc. from Q-Free; and, (2) the information provided by Q-Free in the "parking forecasts", had any independent economic value. Plaintiffs could not "sell" the decision to forego the acquisition of TCS and they could not sell or gain any independent value from the limited information they received from Q-Free regarding TCS International, Inc. Further, that information was the property of Q-Free and **not** the property of the Plaintiffs.

The crucial issue to be determined in cases involving trade secrets, therefore, is whether the information sought to be protected is, in fact and in law, confidential. *Jet Spray Cooler Inc. v. Crampton, 361 Mass. 835 (1972)* The Plaintiffs did not submit any evidence to the jury supporting the necessary element that they could take reasonable steps to protect that

11

information. First, the decision not to acquire TCS International, Inc. from Q-Free was necessarily going to be disclosed to a third party, Q-Free, over whom the Plaintiffs had no control.  Plaintiffs submitted no evidence that Q-Free had any obligation to maintain the confidentiality of the Plaintiffs decision not to acquire TCS International, Inc. Once Plaintiffs notified Q-Free that they did not intend to acquire TCS International, Inc. they had no further control over that information. Similarly, the one sheet of paper with parking forecasts was the property of Q-Free.  The Plaintiffs could exercise no control over what Q-Free decided to do with those forecasts.  Q-Free created the information. Q-Free had the information.  Plaintiffs failed to demonstrate that they had any control over what Q-Free could do with that information. Plaintiffs were not in a position to take reasonable steps to protect that information because it was not exclusively their information. As such, as a matter of law, no reasonable jury could find that the Plaintiffs took reasonable steps to protect the "trade secrets". To put it simply, Plaintiffs cannot take reasonable steps to protect information that they do not control.

The Plaintiffs have not submitted any evidence that the "trade secrets" have an independent economic value. No reasonable jury could have found that the Plaintiffs submitted any evidence that the "trade secrets" had an independent economic value.

Defendant argued that the Plaintiffs failed to prove that the Defendant violated the state or federal trade secrets act.  This argument was conducted on the fourth day of trial. The following is the discussion between counsel and the Court as to Count 3 and 4 of the Plaintiffs' Amended Complaint:

> **MS. BLAIR**: Your Honor, Count 3 is the defense against trade secret acts. I would argue
>
> that with Count 4, because the elements are very similar. It is defendant's contention that
>
> the plaintiffs have not submitted any evidence of a trade secret that was taken by Mr.

Parzych, given to a third party, and then used in that capacity, and that they have not satisfied the elements under either the defense against trade secrets act or against the Massachusetts Trade Secret Act, 9342.

**THE COURT**: Okay. Mr. Cotter?

**MR. COTTER**: Similar situation, the confidential information, and it falls into the definition of a trade secret under the federal Defend Trade Secrets Act and under the state uniform trade secret act.

**THE COURT**: Walk through this slowly for me. Why is the decision to not purchase -- that's what you're talking about, the decision to not purchase the company is a trade secret?

**MR. COTTER**: Yes. It's -- confidential information; trade secret, they often collapse into each other.

**THE COURT**: But they don't always collapse into each other.

**MR. COTTER**: Agreed, a hundred percent, Your Honor. But the fact is, in this case, that decision had value, competitive value to ZipBy and TMA. And Mr. Parzych prevented that value from being maintained and used it to his own benefit; that is, the decision to go forward, whether it's a board decision or just Mr. Karam' decision, it's confidential information only to be used for the benefit of the company. And Mr. Parzych –

**THE COURT**: Tell me a little bit more with what -- how you define -- before you get to whether it was -- the statute was violated, help me a little bit more with what you think the elements are for this to be classified as a trade secret.

**MR. COTTER**: A trade secret is -- can be any financial, business, economic, information, including plans, compilations, you know, methods, techniques, whether

tangible or intangible. If reasonable measures have been taken to keep it secret -- no one gave him permission to take it out of the company or use it for his own benefit. In fact, he was restricted by a –

**THE COURT**: Well, he certainly wasn't supposed to use it for his own benefit. But wasn't he supposed to convey outside the company that ZipBy wasn't interested?

**MR. COTTER**: Yes. Yes, but –

**THE COURT**: So he wasn't supposed to be keeping it confidential?

**MR. COTTER**: Well, he wasn't supposed to be using it for his own benefit and –

**THE COURT**: I understand the using it for his own benefit. I have not taken -- I have not granted their motions on the earlier ones. I get that. But right now, you are trying to put in the box of trade secret something that seems ill fitting there.

**MR. COTTER**: Well, I -- you know, I understand Your Honor's concern, but the fact is -- or the law is that if there's an independent value of that decision to ZipBy, Mr. Parzych can only use it in the way he's supposed to use it, and that's not -- that's not getting back to the incompetent agreement. It's still -- you can violate the trade secret act by use of information, not just misappropriation of it in the first place, or misuse of the information. He obtained the information –

**THE COURT**: I'm less -- I'm less troubled with all the bad things about the using it part. I'm caught up in the definition of a trade secret as it applies here.

**MR. COTTER**: Any information that is of the nature of those things I listed could be a trade secret. It's a very broad definition.

**THE COURT**: It could be in some circumstances. It could be where that information, which is that ZipBy doesn't want to buy TCS. That information, ZipBy has taken

reasonable measures to keep the information secret, and it derives independent economic value from not being generally known, or not being readily ascertainable by other means. I mean, the problem here, the allegations here, is that Mr. Parzych gave you false information, and so you made a decision based on false information; and then he took advantage of that situation. I understand that claim, but put that claim aside for a minute, because right now you're coming in with this different claim. And this different claim says ZipBy has something of value. The value thing is a value to ZipBy. And the value to ZipBy is that they have this secret decision that they aren't going to purchase this company. Well, it's not a secret decision.

**MR. COTTER**: It's a confidential decision. It's only to be communicated to Q-Free and used for the purpose it's intended to be used for. And so the –

**THE COURT**: It's –

**MR. COTTER**: I know it doesn't sound like a classic trade secret, right? And it does -- it is communicated, but it is communicated to -- supposed to be communicated to Q-Free under NDA. They had an ongoing relationship, as Mr. Karam testified to, to keep business information exchanged between them confidential. And so just as the Q-Free data going into ZipBy had to be maintained by ZipBy, the ZipBy data that would go to Q-Free would have to be maintained in confidence. So it doesn't lose its confidential nature just by that.

**THE COURT**: So here's -- here's the problem, though. It has a value by being kept secret, really, only being kept -- only that Mr. Parzych doesn't take action on it. It doesn't have any -- there's no -- if some other company is deciding to buy -- I mean, we have no idea whether Q-Free was asking anybody else to buy them or whatever. And the fact that

ZipBy is or isn't buying it doesn't -- that doesn't -- the issue is you're really saying Mr. Parzych couldn't use this, and Mr. Parzych's using this violates the trade secrets. And the problem is you weren't trying to keep it secret from Mr. Parzych. And so it doesn't –

**MR. COTTER**: I understand, Your Honor, and I'd like to -- I'd like to give you a bench memo on it, because I know I'm leaving out a piece of the federal act, which I don't have in front of me. But he's obtaining the information based on false pretenses, and that's another aspect of the act, so that he can use it for his benefit, and that's another aspect of it. I'm sorry to pile on here, but I'd really like to brief the issue, because I think, with due respect, you're taking a narrow -- an excessively narrow view of trade secret in this circumstance.

**THE COURT**: So I'm -- I will reserve on it, and that will give you an opportunity to brief. And if the jury isn't swayed, then we don't ever have to get there. If the jury is swayed, the motion is renewed. And I am certainly not weighing here, suggesting that this sounds to me like a trade secret claim. It sounds to me like you've got a claim, and you're trying to squeeze it in there. Is there a way that you're going to possibly get away with squeezing it in there? Maybe. I don't know. I'm reserving. But it doesn't -- it's not particularly -- if -- if what you're presenting to me was that Q-Free had given information to ZipBy that it wouldn't have given to employee X, and employee X, in the course of getting it, now takes this information that Q-Free has given to ZipBy and cuts a side deal, that sounds a little bit more like what you're talking about here. But you're not talking about -- so much about the information that Q-Free gave to ZipBy. You're talking about ZipBy's decision not to buy Q-Free. And that doesn't -- that's -- the only independent economic value it has is its being used as an excuse by Mr. Parzych for not abiding by a

noncompete. But it doesn't sound like it's the kind of thing you would normally be talking about in a trade secret act. I'm not going to take it off the verdict form at this point. We'll fight it out afterward, if the jury finds for you.

**MR. COTTER**: Thank you, Your Honor.

Regarding remedies, under the federal Defend Trade Secrets Act this Court may award damages based on actual losses or unjust enrichment. *18 U.S.C. § 1836(b)(3)(B).* Similarly, under Massachusetts Law, a tortfeasor is liable for "all damages" resulting from a violation, which typically consists of lost profits or unlawful gains. *See Mass. Gen. L. Ch. 93 § 42 (2017); Jet Spray Cooler, Inc., 377 Mass. at 169. See also T.H. Glennon v. T.H. Glennon Co. v. Monday CIVIL ACTION NO. 18-30120-WGY* (Due to Glennon's timely intervention in this case, it appears not to have sustained any actual losses from Monday's theft of the Filemaker data that have not already been covered by the analysis for the CFAA violations, supra Section II.B, nor has Monday yet been able to unjustly enrich himself. This Court need not award damages on these facts, and will not do so given the uncertainty surrounding the potential future profitability of TMG Green and the extent to which any profitability could be traced to this violation.) See *USM Corp. v. Marson Fastener Corp., 392 Mass. 334, 340 467 N.E.2d 1271 (1984)* (awarding no damages when defendant accrued no profits from his trade secret violation). In this case there is no evidence that Mr. Parzych earned any profits from the alleged trade secret violation.

Massachusetts trade secrets law authorizes damages based on theories of disgorgement and unjust enrichment. *Bruce v. Weekly World News, Inc.*, 310 F.3d 25, 28 (1st Cir. 2002) (The measure of damages in cases involving business torts such as the misappropriation of trade secrets entitles a plaintiff to recover full compensation for his lost profits and requires a

defendant to surrender the profits which he realized from his tortious conduct."). The "lost profits" are actual losses, not speculative losses. In order to establish defendants' unjust profits, plaintiffs must "'do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement.'" *Real View, LLC. v. 20-20 Techs., Inc., 811 F. Supp. 2d 553, 560-61 (D. Mass. 2011) (quoting Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 711 (9th Cir. 2004)).*

Both Massachusetts trade secrets law and federal copyright law authorize damages based on theories of disgorgement and unjust enrichment. ("The measure of damages in cases involving business torts such as the misappropriation of trade secrets entitles a plaintiff to recover full compensation for his lost profits and requires a defendant to surrender the profits which he realized from his tortious conduct.").

There was no evidence at trial demonstrating Parzych earned any profits.  There was no evidence at the time of trial that the ZipBy entities lost profits as a result of the misappropriation of any alleged trade secret. Even if the speculation introduced by the witness, Mr. Scally, was allowed to show damages for the "lost corporate opportunity" those damages related to the alleged inability of ZipBy to acquire TCS International, Inc., not the use of any trade secret to the disadvantage of Plaintiffs.  The testimony by Mr. Scally related to lost profits as to the inability of ZipBy to acquire TCS from Q-Free. Those lost profits do not in any way relate to the misappropriation of any alleged "trade secret".

As no reasonable jury could find that the Defendant violated the Massachusetts and Federal trade secrets act, no reasonable jury could find that the violation was "willful and malicious" violation. As such, the jury verdict awarding $1,000,000.00 must be set aside.

**Count V and VII/Trademark**

"To prevail in an action for trademark . . . infringement, the plaintiff must establish: '(1) that he uses, and thereby 'owns,' a mark, (2) that the defendant is using that same or a similar mark, and (3) that the defendant's use is likely to confuse the public, thereby harming the plaintiff.'" *Star Financial Services, Inc. v. AASTAR Mortg. Corp.*, 89 F.3d 5, 9 (1st Cir. 1996) (quoting *DeCosta v. Viacom Int'l, Inc.*, 981 F.2d 602, 605 (1st Cir. 1992)).

The central question of the consumer-confusion inquiry is whether a consumer is likely to believe that plaintiff's products and services are in fact produced by defendants. *Boston Beer, 9 F.3d at 180.* For a claim of infringement to succeed, the allegedly infringing conduct must create "a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." *Boston Duck Tours*, 531 F. 3d at 12 (quoting *International Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 201 (1st Cir. 1996)). To determine whether there is a likelihood of consumer confusion of two **competing** marks, the court must consider at least the following factors:

[T]he similarity of the marks; the similarity of the goods; the relationship between the parties' channels of trade; the relationship between the parties' advertising; the classes of prospective purchasers; evidence of actual confusion; the defendants' intent in adopting its mark; and the strength of the plaintiff's mark. *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981). "None of these factors is necessarily controlling, but all of them must be considered." *Star Fin. Servs., Inc. v. AASTAR Mortg. Corp.*, 89 F.3d 5, 10 (1st Cir. 1996)(the counterclaim provides no additional detail from which a reasonable inference of consumer confusion could be drawn.) *See Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 15 (1st Cir. 2004) (listing eight factors used to assess the likelihood of confusion, all of

which compare the parties' use of the marks and business activities). In that case the counterclaim failed to state a claim for infringement under the Lanham Act.

In Massachusetts, the test for common-law trademark infringement is the same as under the Lanham Act*." L&P Bos. Operating, Inc. v. Window Nation, LLC, 626 F. Supp. 3d 461, 467 (D. Mass. 2022) (quoting United Oil Heat, Inc. v. M.J. Meehan Excavating, Inc., 95 Mass. App. Ct. 579, 129 N.E.3d 856, 860 (Mass. Ct. App. 2019)); see Bos. Granite Exch., Inc. v. Greater Bos. Granite, LLC, No. 11-11898, 2012 U.S. Dist. LEXIS 122561, 2012 WL 3776449, at \*5 (D. Mass. Aug. 29, 2012)* ("The standard for trademark infringement  under *Mass. Gen. Laws ch. 93A § 11 and 110H § 12,* and the common law of trademark infringement is essentially the same as that under the Lanham Act.").

A showing of likely consumer confusion requires "more than the theoretical possibility of confusion." *Bos. Duck Tours, 531 F. 3d at 12 (quoting Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr., 103 F.3d 196, 200 (1st Cir. 1996)).* A likelihood of confusion is established where the infringement creates "a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." *Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 10 (1st Cir. 2012).* To determine whether a plaintiff has established a likelihood of consumer confusion, courts in this  circuit look to the following list of factors:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the

plaintiff's mark. *I.P. Lund, 163 F.3d 27, 43 (1st Cir. 1998); see also Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 487 (1st Cir. 1981).*

Plaintiffs again failed to submit any evidence to the jury establishing or supporting a claim of "consumer confusion". As such, their claim for trademark infringement fails as a matter of law.

**Count 6/False Designation**

A person may bring an action for the unauthorized or unsanctioned use of their trade name in interstate commerce which is likely to cause confusion or deception among purchasers regarding the origin of the goods or services. *See Pignons S.A. de Mechanique v. Polaroid Corp.,* 657 F.2d 482, 492-93 (1st Cir.1981); *Calamari Fisheries, Inc. v. Village Catch, Inc.,* 698 F.Supp. 994, 1005-06 (D.Mass.1988); *Railroad Salvage of Conn. v. Railroad Salvage, Inc.,* 561 F.Supp. 1014, 1019 (D.R.I.1983) (Selya, J.). In order for the Plaintiffs to prevail they must prove by a preponderance of the evidence that Defendant, without authorization, used their trade name and the use caused confusion or deception among purchasers regarding the origin of the defendant's goods or services.

There was no evidence submitted by the Plaintiffs that demonstrated that a purchaser or consumer was confused or deceived as to the origin of Defendant's goods (which there were none) or services.  There was nothing to submit to the jury that could reasonably sustain a verdict of violation of the Lanham Act for "false designation".

**Conclusion**

Wherefore, the Defendant respectfully requests that this Honorable Court allow this Motion, set aside the verdict entered by the Jury, and enter judgment on behalf of the Defendant on Counts I, II, III, IV, V, VI, and VII.

Respectfully submitted,
The Defendant
Gregory Parzych
By his attorney

Dionisi, O'Rourke & Bradford, LLP

*/s/ Michelle J. Blair /s/*
_____
Robert F. Dionisi, Jr.
BBO # 125740
Michelle J. Blair
BBO # 564078
Suite 214
365 Boston Post Road
Sudbury, MA 01776
(978) 443-3900
(978) 443-3966 (facsimile)
bob@dobmalaw.com
michellejblair@verizon.net

Certificate of Service

I, Michelle J. Blair, hereby certify that I served a copy of the within Memorandum of Law in Support of Renewed Motion To Enter Judgment upon counsel of record this twenty ninth day of December 2023.

*/s/ Michelle J. Blair /s/*

_____

Michelle J. Blair